Slip Op. 10-134

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                   :
JINING YONGJIA TRADE CO.,          :
LTD., QINGDAO TIANTAIXING           :
FOODS CO., LTD., and HEBEI          :
GOLDEN BIRD TRADING CO., LTD.,:
                                   :
              Plaintiffs,          :   Before: Richard K. Eaton, Judge
                                   :
       v.                          :   Court No. 08-00386
                                   :
UNITED STATES,                     :
                                   :
              Defendant,           :
                                   :
       and                         :
                                   :
FRESH GARLIC PRODUCERS             :
ASSOCIATION, CHRISTOPHER           :
RANCH LLC, THE GARLIC COMPANY,:
VALLEY GARLIC, and VESSEY AND :
COMPANY,                           :
                                   :
              Def.-Ints.           :
_____:
```

OPINION

[Denying plaintiffs' motion for judgment on the agency record and sustaining Department of Commerce's final determination.]

Dated: December 16, 2010

*Trade Bridge* (*Li Jasmine Zhao*), for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Scott McBride*), of counsel, for defendant.

*Kelley Drye & Warren, LLP* (*Michael J. Coursey* and *John M. Herrmann*), for defendant-intervenors.

Eaton, Judge:   This matter is before the court on the motion for judgment on the agency record of plaintiffs Jining Yongjia Trade Co., Ltd. ("Yongjia"), Qingdao Tiantaixing Foods Co., Ltd. ("QTF"), and Hebei Golden Bird Trading Co., Ltd. ("Golden Bird") (collectively, "plaintiffs").   *See* Pls.' Br. Supp. Mot. J. Agency R. ("Pls.' Br.").   Defendant the United States and defendant-intervenors the Fresh Garlic Producers Association, Christopher Ranch LLC, The Garlic Company, Valley Garlic, and Vessey and Company (collectively, "defendant-intervenors") oppose the motion.   *See* Def.'s Mem. Opp. Pls.' Mot. J. Agency R. ("Def.'s Mem."); Def-Ints.' Br. Resp. Pls.' Mot. J. Agency R ("Def.-Ints.' Br.").

By their motion, plaintiffs challenge the final results of the United States Department of Commerce's ("Commerce" or the "Department") twelfth new shipper reviews of the antidumping duty order on fresh garlic[1] from the People's Republic of China ("PRC" or "China") for the period of review November 1, 2006 to April

---

[1]     Fresh garlic under the antidumping duty order includes:

> all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing.

Fresh Garlic from the PRC, 73 Fed. Reg. 24,042, 24,042 (Dep't of Commerce May 1, 2008) (preliminary results of the twelfth new shipper reviews) ("Preliminary Results").

30, 2007 ("POR"). *See* Fresh Garlic from the PRC, 73 Fed. Reg.
56,550 (Dep't of Commerce Sept. 29, 2008) (final results and
rescission, in part, of twelfth new shipper reviews) ("Final
Results") and the accompanying Issues and Decision Memorandum
("Issues & Dec. Mem.") (Dep't of Commerce Sept 19, 2008).
Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2006) and 19
U.S.C. § 1516a(a)(2)(B)(iii) (2006).

     For the reasons set forth below, the court denies
plaintiffs' motion and sustains Commerce's Final Results.


                              BACKGROUND

     On May 21, 2007, plaintiffs asked Commerce to initiate new
shipper reviews on their sales of fresh garlic to the United
States. Fresh Garlic from the PRC, 72 Fed. Reg. 38,057, 38,057-
58 (Dep't of Commerce, July 12, 2007) (initiation of antidumping
duty new shipper reviews). Commerce initiated the twelfth new
shipper reviews on July 12, 2007. *Id.* at 38,060. The purpose
of a new shipper review is to determine whether an exporter or
producer is entitled to its own antidumping duty rate under an
order, and if so, to calculate that rate. *See Hebei New Donghua
Amino Acid Co., Ltd., v. United States*, 29 CIT 603, 604, 374 F.
Supp. 2d 1333, 1335 (2005).

     On May 1, 2008, Commerce published its preliminary results.
Fresh Garlic from the PRC, 73 Fed. Reg. 24,042, (Dep't of

Commerce May 1, 2008) (preliminary results of the twelfth new

shipper reviews) ("Preliminary Results"). In reaching its

Preliminary Results, Commerce compared each company's export

price[2] to normal value[3] in order to to determine if its sales

were at prices below fair value. *See* 19 U.S.C. § 1677b(a).

Because China is a non-market economy ("NME"),[4] Commerce,

pursuant to 19 U.S.C. § 1677b(c)(1), selected India as the

surrogate country for purposes of calculating normal value.

---

[2]     The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted by
19 U.S.C. § 1677a(c).  19 U.S.C. § 1677a(a).

[3]     Normal value is defined as

> the price at which the foreign like product
> is first sold (or, in the absence of a sale,
> offered for sale) for consumption in the
> exporting country, in the usual commercial
> quantities and in the ordinary course of
> trade and, to the extent practicable, at the
> same level of trade as the export price or
> constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

[4]     A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).

Preliminary Results, 73 Fed. Reg. at 24,044.  Commerce then

calculated the normal value of fresh garlic for QTF and Golden

Bird using its standard factors of production ("FOP")

methodology.[5]

For grower Yongjia, however, Commerce employed a modified

methodology to construct normal value that used the surrogate

value for the whole garlic bulb as an intermediate product.[6]  As

---

[5]     Plaintiffs QTF and Golden Bird are processors and
exporters of garlic that purchase whole garlic bulbs and process
them for export.  In determining the standard FOPs for these
respondents, Commerce began with the surrogate value of the whole
garlic bulb. Preliminary Results, 73 Fed. Reg. at 24,045 n.4.

[6]     Commerce articulated the difference between the whole
garlic bulb and fresh garlic in the Issues and Decision
Memorandum for the tenth administrative review when it stated:

> It is important to distinguish the fact that
> the raw garlic bulb that is harvested from
> the ground, however, is not immediately
> shipped to the United States.  Rather, the
> garlic that PRC exporters ship to the United
> States requires at least a minimum amount of
> processing and packing prior to export.  We
> have learned through the conduct of several
> administrative and new shipper reviews that
> the garlic harvested from the ground is, at a
> minimum, cleaned to remove the outer skins in
> order to give the garlic bulb its
> characteristic white, fresh appearance.  This
> whole [garlic bulb] is then typically packed
> in mesh bags and cartons for shipment to the
> United States.  In the case of peeled garlic,
> the processing is more extensive and
> typically involves additional labor, energy,
> and several packing inputs (including the use
> of an antiseptic solution and nitrogen gas).

Fresh Garlic from the People PRC, 71 Fed. Reg. 26,329 (Dep't
                                    (continued...)

a result, the cost (or value) of the whole garlic bulb was used

as a substitute for the costs of the growing and harvesting FOPs

("upstream FOPs") actually reported by Yongjia.  The Department

stated that it used this intermediate input methodology because

it was unable to verify the values for Yongjia's upstream FOPs.

Issues & Dec. Mem. at Comm. 2.

Commerce arrived at the value for whole garlic bulbs using a

simple average of prices for the "Super A" grade garlic bulb in

India from daily data published by the Azadpur Agricultural

Produce Marketing Committee ("APMC") in its "Market Information

Bulletin" ("APMC Bulletin").  Preliminary Results, 73 Fed. Reg.

at 24,046.  The Department published its final results on

September 29, 2008, having calculated margins of 32.78 percent

for QTF, 13.83 percent for Golden Bird, and 18.88 percent for

Yongjia.[7]  Final Results, 73 Fed. Reg. at 56,552.  Yongjia

contests the use of Commerce's intermediate input methodology in

calculating its rate, but not the methodology itself.  The other

---

[6](...continued)
Commerce May 4, 2006) (final results and partial rescission of
antidumping Duty administrative reviews and final results of new
shipper reviews) ("Tenth Admin. Review Final Results") and
accompanying Issues and Decision Memorandum ("Tenth Admin. Review
Issues & Dec. Mem.") at 13.

[7]     The small change in margins from the Preliminary
Results to the Final Results was a result of Commerce adopting a
revised wage rate of U.S. $1.04 for the PRC, as well as a post-
preliminary results clarification/correction to the margin
calculations with respect to the cost of mesh bags for all
plaintiffs.  Final Results, 73 Fed. Reg. at 56,551.

plaintiffs and Yongjia all challenge Commerce's decision to use the APMC Bulletin data for the surrogate value of the whole garlic bulbs.

## STANDARD OF REVIEW

The court must uphold a final determination by the Department in an antidumping proceeding unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citations omitted) (*"Huaiyin"*). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The possibility of drawing two equally justifiable, yet inconsistent conclusions from the record does not prevent the agency's determination from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004).

DISCUSSION

I.   Calculation of Normal Value

For merchandise exported from NMEs, Commerce "shall
determine the normal value of the subject merchandise on the
basis of the value of the factors of production used in producing
the merchandise, to which shall be added an amount for general
expenses and profit plus the cost of containers, coverings, and
other expenses." 19 U.S.C. § 1677b(c)(1). The statute directs
Commerce to use the "best available information regarding the
values of such factors . . . ." *Id.*

Further, in valuing the FOPs, Commerce "shall utilize, to
the extent possible, the prices or costs of factors of production
in one or more market economy countries that are . . . (A) at a
level of economic development comparable to that of the nonmarket
economy country, and (B) significant producers of comparable
merchandise." *Id.* § 1677b(c)(4). The FOPs used in the
valuation include, but are not limited to: "(A) hours of labor
required, (B) quantities of raw materials employed, (C) amounts
of energy and other utilities consumed, and (D) representative
capital cost, including depreciation." *Id.* § 1677b(c)(3).

A.   Development of the Intermediate Input Methodology

In accordance with the NME statutory scheme outlined above,
Commerce usually determines normal value based on the FOPs as

reported by respondents. *See* 19 U.S.C. § 1677b(c)(1), (3). In

valuing the FOPs, the Department uses the cost that would have

been incurred for each of them in a surrogate country. In the

two periodic administrative reviews that preceded Yongjia's

request for a new shipper review, however, Commerce questioned

the use of its normal factors of production methodology for the

respondents that grew garlic because of vagaries in the reporting

of the FOPs for garlic farming in China.

Specifically, in the ninth administrative review, Commerce

found that environmental factors, not within the control of the

farmers, i.e., weather, were difficult to accurately record and

could impact growth patterns and yield rates. Fresh Garlic from

the PRC, 70 Fed. Reg. 34,082 (Dep't of Commerce June 13, 2005)

(final results of ninth administrative review) and accompanying

Issues and Decision Memorandum ("Ninth Admin. Review Issues &

Dec. Mem.") at 11-12. The Department also found that respondents

were not able to "capture or record in their books and records

information such as the amount of fertilizer blown away by wind

or the amount of seed destroyed by a heavy rainfall." *Id.* at 12.

In addition, Commerce found it important that respondents

did not own the land on which the garlic was grown. *Id.* Garlic

has an eight-to-nine month growing season, and because

respondents leased the land, three or four months out of the year

other crops were grown on it. *Id.* As a result, respondents had

no control over the land for this time period and the effect on the land of the "off season" crops was not reported by respondents. *Id.* Commerce found significant "the effect that such crops might have on the acidity or nitrogen content of the soil, [and that] farmers using this land might use liquid or granular herbicide or pesticide that remains on the land or in the soil and benefits subsequent crops." *Id.* Thus, for the Department, the possible effects of these off season activities "might explain a poor, or positive, yield in the subsequent garlic crops, and none of this will appear in the breakdown of FOPs provided in a respondents' [sic] books and records, thereby diminishing the respondents' [sic] ability to measure and report accurate FOPs to the Department." *Id.*

Commerce also expressed concern that the respondents in the ninth administrative review did not "keep the types of books and records that would allow the Department to establish the appropriateness or accuracy of the reported FOPs." Ninth Admin. Review Issues & Dec. Mem. at 12. According to the Department, the deficiencies in the respondents' records could not be corrected by on-site reviews because the long growing and harvesting process for garlic did not permit it to observe planting, growing and harvesting activities in the PRC, and, thus, Commerce could "conduct only paper verifications" of these processes. *Id.* at 13.

Commerce continued to use its usual FOP methodology in the ninth administrative review, but stated that it "intend[ed] in future administrative reviews to examine whether or not, and the extent to which, standard verification procedures can be applied to respondents' books and records, as they relate to the growing and harvesting FOPs of fresh garlic in the PRC." *Id.* The Department also stated that it "intend[ed] to examine more closely the ability of respondents to provide accurate, complete and most importantly, verifiable FOP data in questionnaire responses to the Department, when the normal books and records of these respondents apparently do not reflect all of the information relevant to such an analysis." *Id.*

Following its stated intentions from the ninth administrative review, Commerce, in the tenth administrative review, concluded that it would endeavor to capture the complete costs of producing "fresh garlic" by valuing the "fresh garlic bulb" as an intermediate product. Fresh Garlic from the People PRC, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (final results and partial rescission of antidumping duty administrative reviews and final results of new shipper reviews) ("Tenth Admin. Review Final Results") and accompanying Issues and Decision Memorandum ("Tenth Admin. Review Issues & Dec. Mem.") at Comm.

1.[8]  Because of this change, rather than base normal value on the

sum of surrogate values for the upstream FOPs reported by

respondents, Commerce would assume that these costs were all

contained in the price of the end product, the whole garlic bulb

itself.

Building on the findings it made during the ninth

administrative review, in the tenth administrative review,

Commerce found that "respondents in this industry do not track

actual labor hours incurred for growing, tending, and harvesting

activities and, thus, do not maintain appropriate records which

would allow them to quantify, report and substantiate this

information."  Tenth Admin. Review Issues & Dec. Mem. at 11.  In

addition, Commerce found "significant problems with respondents'

ability to report yield loss that results from the shrinkage that

occurs during the production of garlic."  *Id.*  The Department

"noted that there are many unknown variables that may affect or

influence reported FOPs which are not accounted for in the

respondents' books and records."  *Id.*  Commerce also concluded

that "the respondents also differed significantly in how each

reported its garlic seed usage."  *Id.*  Finally, Commerce

"determined that the books and records maintained by the

respondents do not report or account for all of the relevant

---

[8]     The tenth administrative review is currently before
this Court in *Jinan Yipin Corp., Ltd.* v. *United States*, Court No.
06-00189.

information and do not allow the respondents to identify all of

the FOPs necessary to grow and harvest garlic, which

significantly inhibits the Department's ability to conduct a

meaningful verification of reported information"  *Id.*

    Based on these findings, the Department determined that an

intermediate input methodology was appropriate for growers of

fresh garlic beginning with those in the tenth administrative

review.  *Id.*  The tenth administrative review, however, was not

the first time that the Department had used an intermediate input

methodology.  Commerce had previously relied on this methodology

in the *Certain Frozen Fish Fillets* less than fair value

determination.  *See* Certain Frozen Fish Fillets From the

Socialist Republic of Vietnam, 68 Fed. Reg. 4986, 4993 (Dep't of

Commerce Jan. 31, 2003) (notice of preliminary determination of

sales at less than fair value, affirmative preliminary

determination of critical circumstances and postponement of final

determination) ("*Fish Fillets*").[9]

---

    [9]  Commerce's determination to use an intermediate input
methodology in *Fish Fillets* was challenged before this Court in
*An Giang Agriculture & Food Import Export Co. v. United States*,
Court No. 03-00563.  The case was voluntarily dismissed following
the ruling in *Anshan Iron and Steel Co. v. United States*, 29 CIT
306, 307, 366 F. Supp. 2d. 1280, 1280 (2005), that Commerce had,
on remand, sufficiently explained it decision to value the
respondents' self-made intermediate inputs by specifically
explaining why the upstream FOPs were unreliable.  *See Anshan
Iron and Steel Co. v. United States,* 28 CIT 1728, 1737-38, 358 F.
Supp. 2d 1236, 1244 (2004) ("If Commerce concludes that the value
obtained from reliance upon Plaintiff's values for its factors of
                                                  (continued...)

In *Fish Fillets*, Commerce set out two exceptions to the standard FOP analysis that would permit the use of a surrogate value for an intermediate input.  The second of these was where "it is clear that attempting to value the factors used in a production process yielding an intermediate product would lead to an inaccurate result because a significant element of cost would not be adequately accounted for in the overall factors buildup." *Fish Fillets*, 68 Fed. Reg. at 4993.  Commerce referenced this second exception from *Fish Fillets* in the tenth administrative review, and determined to use the value of the whole garlic bulb as the starting point to construct normal value.  Tenth Admin. Review Issues & Dec. Mem. at 4.

    B.    Application of the Intermediate Input Methodology in the Current Review

Having employed the intermediate input methodology for existing shippers in the tenth administrative reviews, Commerce decided to continue this practice for Yongjia in the new shipper review now before the court.  Preliminary Results, 73 Fed. Reg. at 24,045.  In this new shipper review, Commerce found that Yongjia was the only respondent that farmed garlic (rather than

---

[9](...continued)
production for self-produced intermediate inputs would not fulfill its statutory obligation to use the best available information, it must specifically describe how the information is unreliable.").

buying it), and further concluded that the company "was unable to accurately record and substantiate the complete costs of growing garlic during the POR." *Id.* In other words, even though Yongjia grew its own garlic and supplied Commerce with the claimed upstream FOPs used in farming its product, Commerce found, as it had found with growers in the tenth administrative review, that it could not achieve an accurate result in constructing normal value if it used the FOPs reported by respondent. "The alternative to the standard FOP analysis, as articulated in *Fish Fillets*, is only applied when the Department conclude[s] that it simply is unable to apply the FOP analysis to a Respondent's overall reported data." Issues & Dec. Mem. at Comm. 2.

Thus, the Department decided to construct the company's normal value using the price for whole garlic bulbs sold in India as a beginning point, just as it had for shippers who farmed garlic in the tenth administrative review. Def.'s Mem. 13 ("Commerce found 'significant discrepancies between what Yongjia reported and what [Commerce] observed' at verification. Specifically, Commerce concluded that Yongjia's books and records did not accurately report factors of production relating to labor, yield loss, cold storage electricity, off-season activities, water usage and land usage.").

Yongjia does not question Commerce's practice of using its intermediate input methodology. Indeed, the company concedes the

Department may employ the methodology under the right set of

circumstances.  Rather, Yongjia disputes the methodology's use in

this case.[10]  Pls.' Br. 16.  In doing so, Yongjia claims that

Commerce's decision to use its intermediate input methodology was

not supported by substantial evidence.  Pls.' Br. 16 ("Although

Commerce has discretion to resort to intermediate input, such

discretion need to be validated by substantial evidence.").

    The company argues that its upstream FOPs could have been

valued by the Department and that the use of the second *Fish

Fillets* exception to the standard FOP methodology was not

supported by substantial evidence.  Pls.' Br. 16 ("[I]t is

completely necessary for Commerce to provide sufficient evidence

to prove that a respondent is not able to provide sufficient

factual evidence that it fails to maintain the necessary

information in its internal books and records that would allow

Commerce to establish the completeness and accuracy of the

reported FOPs.  The hurdle shall be higher.  Minor findings of

discrepancies or a different calculation method shall not be

---

[10]     At no point in their complaint do plaintiffs question
Commerce's authority to use its intermediate input methodology as
set out in *Fish Fillets*.  *See generally* Compl.  Thus, the
legality of the intermediate input methodology is not before the
court.  The court, therefore,  expresses no opinion as to whether
the methodology complies with 19 U.S.C. § 1677b(c)(1) and (3).
It is worth noting, however, that the results in this case would
be the same if, rather than using its intermediate input
methodology, Commerce had chosen to treat the whole garlic bulb
as a raw material.  *See* 19 U.S.C. § 1677b(c)(3)(B).

taken as sufficient evidence."). Yongjia insists that the

intermediate input methodology cannot be used here because

Yongjia provided complete and accurate FOP information, and,

therefore, the normal FOP methodology should have been applied in

calculating its normal value. Pls.' Br. 17.

The Department reached its conclusion that Yongjia could not

accurately account for the upstream FOPs by evaluating the

company's questionnaire responses and by making a site visit to

the garlic fields. Commerce detailed its findings in the Issues

and Decision Memorandum, setting out the problems it found with a

number of the FOPs reported by Yongjia, i.e., it found: (1) that

"Yongjia was unable to accurately track labor hours;" (2) that

there were "problems with Yongjia's ability to report yield loss

resulting from the shrinkage that occurs during the production of

garlic;" (3) that there existed "major discrepancies between the

farming labor reported and that observed during verification . .

. [and] that Yongjia underreported harvesting labor in excess of

15 percent;" (4) that Yongjia did not weigh the harvested garlic

for several weeks after harvest, and thus failed to take into

account any yield loss from the garlic drying out; (5) that based

on its finding that "Yongjia was unable to accurately report the

garlic stored in its cold storage facility and because we were

unable to verify its main electricity meter," that it did "not

have the information necessary to accurately capture a proper

cold storage electricity FOP;" (6) "that the reported water used

for irrigation of the garlic crop was based on an estimate rather

than actual water consumption;" (7) that supported by its

knowledge of "the known structure of the Chinese garlic industry

and the understanding that non-garlic inputs can have an effect

on garlic production . . . the reported upstream inputs used to

produce the raw garlic bulb are not entirely accurate and do not

account for off-season factors;" (8) that, regarding land use,

"the record shows that Yongjia cannot accurately report the

precise land area under cultivation for its leased farm;" and,

finally, (9) that "Yongjia's argument that the cotton grown in

the off-season is a special kind of cotton which is resistant to

pests and requires no pesticide" should be disregarded based on a

lack of "record evidence concerning the type of cotton grown in

the off-season, or whether this cotton is resistant to pests."

Issues & Dec. Mem. at Comm. 2.

     In making its claim that Commerce should have used its

standard FOP methodology to construct normal value, Yongjia takes

issue with three of the Department's findings.  First, in

response to Commerce's finding that there were major

discrepancies between the farm labor reported and that observed

during verification, Yongjia maintains that the discrepancy

resulted from a misunderstanding of the facts.  Pls.' Reply. Br.

Supp. Mot. J. Agency R. ("Pls.' Reply Br.") 11.  "When

harvesting, farmers usually put out newly harvested wet garlic

for four to five days for air dry.  However, during verification,

farmers had no time to dry the wet garlic, so they used wet

garlic, which was more difficult to handle with and took longer

time in later steps: trimming the roots and cutting the stems."

Pls.' Reply Br. 11.  Although this argument seems addressed at

Commerce's statement that Yongjia failed to keep accurate records

of labor used to grow its garlic, it does not appear to seriously

call into question the Department's findings.  Rather, Yongjia's

statement tends to confirm that the Department was unable to

verify Yongjia's reported labor FOP for growing the garlic.

    With regard to Commerce's finding that Yongjia did not

accurately calculate harvesting and cold storage yield loss,

plaintiffs state that Commerce's request "to provide yield loss

calculation from the point harvesting the garlic which is covered

with water and mud . . . is not reasonable."  Pls.' Reply Br. 11.

Instead, "Yongjia reported its yield loss starting from total

gross dry garlic minus garlic set aside for seed as denominator."

Pls.' Reply Br. 11-12.  Again, Yongjia does not directly address

Commerce's finding regarding yield loss due to shrinkage during

production.  Instead, Yongjia urges the Department to start its

analysis after the garlic was already dry.

    Commerce's findings, however, were directed at what took

place prior to the point at which the garlic was dry.  For

instance, Commerce found during verification that the total

harvest reported did not include "[g]arlic which is too small or

damaged that is given to the workers to take home[,] [t]he

approximate percentage of water weight the garlic loses from the

time it is dug from the fields to the time it is first weighed,

[or] [d]iscolored garlic which is thrown away." Admin. R. ("AR")

Doc. No. 167 at 17-18.  Commerce also found that Yongjia

underrreported its "total harvest, the starting point for its

yield loss calculation and the denominator for its farming

factors of production." *Id.* at 18.  By not directly addressing

these findings, Yongjia tacitly confirms them.

    Finally, the company argues that Commerce's statement that

Yongjia estimated "electricity consumption for cold storage of

garlic" is not accurate.  Yongjia claims that it knew that each

bag used for cold harvest weighed forty four kilograms per bag,

and that it used the number of bags times forty four kilograms to

find the cold storage weight used to calculate electricity

consumption.  Pls.' Reply Br. 12.  Thus, for Yongjia, its

calculation was not an estimate, and should have been accepted as

a replacement for metered electricity.  It is difficult to see,

however, how Yongjia's proposed calculation would be a good

substitute for metered electricty.

    As discussed *supra*, Commerce identified a number of

Yongjia's upstream FOPs that it determined could not be used in

its normal FOP methodology.  The company was given an opportunity

to address the identified problems with its reported FOPs on

several occasions and failed to do so to Commerce's satisfaction.

*See*, *e.g.*, AR Doc. No. 182.  As has been seen, Yongjia has

continued to fail to directly address Commerce's findings before

the court.  Based on the material found in the Issues and

Decision Memorandum, and Yongjia's apparent inability to produce

evidence calling Commerce's findings into question, the court

concludes that Yongjia's reported upstream FOPs do not provide

the basis for calculating normal value.  *See* Final Results, 73

Fed. Reg. at 56,552 (Commerce's reliance on Yongjia's reported

FOPs "would lead to an inaccurate result because the Department

would not be able to account for a significant element of cost .

. . .").

    Based on the foregoing discussion, the court holds that

Yongjia's contention that Commerce exceeded its discretion by not

using its reported upstream FOPs is without merit.[11]

_____

    [11]    While the court does not have before it the question
whether the intermediate input methodology conforms to the
statute, it is worth noting that the cases Commerce cites do not
necessarily support its use.  For instance, the Department relies
on *Shakeproof Indus. Assembly Components. of Illinois Tool Works
Inc. v. United States,* 268 F.3d 1376 (Fed. Cir. 2001)
("*Shakeproof*").  In that case, the Federal Circuit was presented
with the question of whether it was legally permissible for
Commerce to value factors of production using market prices when
constructing normal value.  *Id.* at 1381-82.  In other words, the
question was not whether Commerce was required to use the four
factors of production set out in 19 U.S.C. § 1766b(c)(3), but,
(continued...)

II.  Surrogate Values of Garlic Bulbs

     Yongjia, QTF and Golden Bird each challenge Commerce's

selection of the APMC Bulletin data as the surrogate value for

whole garlic bulbs.  Pls.' Br. 2.  Pursuant to statute, the

information used by Commerce to value FOPs is to be the "best

available information regarding the values of such factors [of

---

[11](...continued)

rather, how to place a price on them.  In reaching its conclusion
that using market prices was a permissible interpretation of the
statute, the Court relied on the language of 19 U.S.C.
§ 1677b(c)(4), which directs Commerce to value factors of
production using surrogate prices "to the extent possible."
Thus, the Court found that where it was not possible to derive
the "best possible information" from surrogate values, market
values (which were the best possible information) could be used.
*Id.*  Thus, the case stands for the proposition that Commerce may
use market *prices* to value FOPs, but does not hold that it may
ignore the direction in 19 U.S.C. § 1677b(c)(3) to use specific
FOPs in its methodology.

     Commerce also cites *Lasko Metal Products, Inc. v. United
States*, 43 F.3d 1442 (Fed. Cir. 1994).  There, Commerce valued
some factors of production using surrogate values, and some using
the values from market purchases made by the exporter.  The Court
affirmed the use of this "mix and match" methodology, stating
that, "[i]n this case, the best available information on what the
supplies used by the Chinese manufacturers would *cost* in a market
economy was the price charged for these prices on the
international market."  *Id.* at 1446 (emphasis added).  As a
result, both cases stand solely for the proposition that when
valuing factors of production, i.e., placing a price on them,
Commerce may use market value prices that represent the "best
available information."

     Commerce's intermediate input methodology, however, may not
take advantage of the "to the extent possible" language found in
§ 1677b(c)(4) because that phrase is restricted to the "prices or
costs" of factors of production, and not to the factors
themselves.  Nor may Commerce rely on the "best available
information" language cited by the Federal Circuit in *Shakeproof*
as this language also relates solely to valuation.

production] in a market economy country or countries considered

to be appropriate."  19 U.S.C. § 1677b(c)(1).  Commerce's

practice, in selecting the best available information for valuing

FOPs, is to select "surrogate values which are product-specific,

representative of a broad market average, publicly available,

contemporaneous with the POR and exclusive of taxes and duties."

Issues & Dec. Mem. at Comm. 4.  This practice has found approval

in this Court.  *See, e.g., Allied Pacific Food (Dalian) Co. Ltd.*

*v. U.S.*, 34 CIT __, __, 716 F. Supp. 2d 1339, 1343 (2010).  As

has been noted, Commerce decided to use the surrogate value for

whole garlic bulbs from India: (1) as a raw material in its

standard FOP methodology to construct normal value for QTF and

Golden Bird; and (2) as the starting point to calculate normal

value for Yongjia using the intermediate input methodology.  No

party disputes Commerce's choice of India as the surrogate

country.

     The APMC Bulletin price data chosen by the Department as the

data source for whole garlic bulbs was submitted by defendant-

intervenors.  AR Doc. No. 116, Ex. 2.  Commerce chose to use this

source, even though plaintiffs placed two other possible data

sources on the record: (1) the World Trade Atlas ("WTA") data;

and (2) data from AGMARKNET, an online database maintained by the

Indian Ministry of Agriculture.  Plaintiffs also put the Azadpur

APMC data found *online* on the record in order to demonstrate the

claimed unreliability of the APMC Bulletin data.  AR Doc. No. 103
at 3-5.

In reaching its decision to value whole garlic bulbs using
the prices reported in the APMC Bulletin, Commerce found that the
data was the best available because: (1) it was publicly
available as a result of being posted at the APMC facilities for
public viewing, could be obtained in pamphlet form at the APMC
facilities, and is electronically archived and accessible on
request; (2) it was product specific, in that it was the only
data on the record that included information on grades of garlic,
which are size dependant, a factor that, according to Commerce,
plays heavily in the valuation of garlic bulbs; (3) it
represented a broad market average as a result of APMC being "the
largest fruit and vegetable market in Asia [that] has become a
'National Distribution Centre' for important Indian agricultural
products, such as garlic;" and (4) it was from a source that
contained information for each day on which the Super-A bulbs
were traded during the POR, and, therefore, was contemporaneous
with the POR.  Issues & Dec. Mem. at Comm. 4 (internal citations
omitted).

Plaintiffs argue that, during the administrative
proceedings, they "disagreed with Commerce's use of Azadpur APMC
Bulletin data because (a) it is not publicly available

information;[12] (b) it is not product specific, as size-specific

criterion distorts product-specific requirement by Commerce's

practice; and (c) the values of [the Super-A bulbs were] not

contemporaneous with the POR."  Pls.' Br. 4.


    A.   Public Availability of Azadpur APMC Bulletin Data

    In making their arguments with respect to public

availability, plaintiffs first submit that the APMC Bulletin data

is not the same as that which can be downloaded from the official

APMC website.  Pls.' Br. 7.  Plaintiffs then assert that because

it differs from that on the APMC website, the APMC Bulletin data

is not publically available.  Pls.' Br. 7-8.

    It is apparent that plaintiffs' claim is without merit.

First, the APMC website does not purport to contain all of the

APMC Bulletin data; rather, it provides a summary of the APMC

Bulletin data.  AR Doc. No. 158 ("the Azadpur APMC website

(www.apmcazadpurdelhi.com) provides summary information on garlic

arrival quantity, maximum price, modal price and minimum price

---

[12]     When Commerce has determined that it must use a
surrogate value for calculating normal value, it will "normally
use publicly available information" for valuation purposes.  19
C.F.R. § 351.408(c)(1) (2009).  "Publicly available" is not
defined by statute or regulation.  Further, the word "normally"
indicates that Commerce is well within its bounds to use non-
public information if it determines that it is the best
information available.  *Dorbest Ltd. v. United States,* 30 CIT
1671, 1678, 462 F. Supp. 2d 1262, 1270 (2006) (stating that "use
of the word 'normally' means that Commerce may select other data
as warranted under the circumstances").

but as yet does not provide grade-wise information."). This is

apparently why plaintiffs were unable to find some of the

information found in the APMC Bulletins online, particularly

information relating to garlic grades. Pls.' Br. 7 ("On Azadpur

APMC official website, there is no report of garlic grading as

grade A, B C [sic] or [Super-A]."). That all of the data found

in the APMC Bulletins is not also found on the website, however,

does not render the APMC Bulletins somehow unavailable to the

public.

Next, plaintiffs claim that because the APMC Bulletins can

only be obtained at the APMC market, they are necessarily not

publically available. According to the Chinese companies,

because the data cannot be downloaded from the internet, it is

unavailable to the public. Pls.' Br. 8. As defendant points

out, however, "court documents generally are considered to be

publicly available if one can go to the courthouse to request the

documents." Def.'s Mem. 24. For the Department, because the

APMC Bulletins could be obtained by anyone who went to the market

and asked for them, and because the APMC Bulletin information was

publicly posted and maintained on the APMC database in electronic

form, it was publicly available. Issues & Dec. Mem. at Comm. 4.

In addition, according to the Department, the APMC Bulletins

were public even if not available on the internet in their

entirety. That is, Commerce determined that the full APMC

Bulletin data was publicly available because, while it "is not readily available on the internet, it is readily available to its intended public audience, wholesalers and buyers at Azadpur APMC in India." Issues & Dec. Mem. at Comm. 4.  Moreover, Commerce states that it has electronic versions of each daily bulletin for the POR; a full six months of data, on which it based its surrogate values. *Id.*

The APMC Bulletin documents are clearly public as that word is normally understood.  That is, they are available to anyone who goes to the market and asks for them.  Plaintiffs fail to explain why the APMC Bulletins are not publicly available merely because they are not on the internet.  As a result, plaintiffs' argument that the APMC Bulletin data was non-public is unconvincing.

Next, plaintiffs take issue with the identities of the consultants defendant-intervenors hired to author the Market Research Report.[13]  *See* Pls.' Br. 8-9.  The companies argue that because the names of the consultants were never disclosed to plaintiffs, the data in the Market Research Report is

---

[13]    The Market Research Report was prepared by defendant-intervenors to support the use of the APMC Bulletin data as the surrogate value data.  The only information to which plaintiffs' counsel did not have access in the Market Research Report was the name of the expert hired by defendant-intervenors to prepare the report, and the names and titles of certain persons who provided information, but the name of the company hired, as well as all of the actual information used in preparing the report, was not treated as privileged.  Issues & Dec. Mem. at Comm. 4.

unverifiable.  *See* Pls.' Br. 8-9.  According to plaintiffs, there

was no way to "figure out the existence of such a database ready

for pick-up by physically visiting Azadpur APMC market," except

by being told so by defendant-intervenors' consultants.  Pls.'

Br. 8.

In the Issues and Decision Memorandum, Commerce concluded

that because "the report does identify the organization that each

of the sources represents, and all other information in the

report is public[,]" the confidentiality granted to the

identities of the independent consultants had no bearing on the

verifiability of the APMC Bulletin data.  Issues & Dec. Mem. at

Comm. 4.  In other words, Commerce's decision to keep the names

of the defendant-intervenors' consultants confidential did not

prevent plaintiffs from challenging the accuracy or reliability

of the APMC Bulletin data, because the sources of the data were

clearly stated.  Thus, had plaintiffs wished to find out for

themselves if the APMC Bulletins were publically available and

contained the information Commerce found therein, they could have

done so, whether defendant-intervenors' consultants were known to

them or not.  Therefore, plaintiffs' argument cannot be credited.

Finally, plaintiffs contend that the AGMARKNET data is more

public than the APMC Bulletin data because it is "[a]n internet-

based market information system . . . sponsored by Indian

Agricultural Marketing Information System under the Department of

Agriculture & Cooperation, Ministry of Agriculture . . . .
Furthermore, people get access to the information through the
internet; it bypasses middlemen, which is different from
government related APMC."  Pls.' Br. 9.  Regardless of whether
the AGMARKNET data is more easily accessible, for the reasons
previously noted, Commerce's determination that the APMC data is
publicly available remains valid.  The Department's longstanding
preference is for "publicly available information," not
necessarily the most publicly available information.  Under the
facts of this case, there is nothing to indicate that the APMC
Bulletins were not publically available.  19 C.F.R.
§ 351.408(c)(1) (2009).


    B.   Product Specificity of APMC Bulletin Data

    Plaintiffs also challenge the APMC Bulletin data on the
grounds that it was not product specific.  Pls.' Br. 3.  The
Chinese companies argue that, in order to make its analysis
product specific, Commerce should have looked at the local
factors in India and China, including the natural endowments of
the land, climate, labor skills, traditions and experiences,
while conducting its FOP analysis.  Pls.' Br. 10-11 ("As the
Department decides India as the surrogate country in this review,
it is necessary to compare the garlic production and local
producer prices in the two countries.").  In other words,

plaintiffs maintain that, while the size of the garlic bulb was a relevant factor in selecting the surrogate value, Commerce failed to take into account the numerous differences between growing and harvesting the garlic in India and in China.  In addition, the Chinese companies contend that Commerce should have considered that China produces more garlic at cheaper prices than India. Pls.' Br. 11 ("According to the statistics from the Food and Agriculture Organization, China, as compared to India, has much higher garlic production and lower prices.").

For its part, defendant insists that "[s]uch a comparison of the production experience of a non-market economy, such as China, and a market economy, such as India, is illogical.  The use of surrogate values recognizes that market principles apply differently in non-market economies." Def.'s Mem. 25.  In a similar vein, defendant-intervenors contend that Commerce's "non-market economy methodology does not provide for the consideration of growing conditions in China, but rather requires normal value to be derived based on the value of the factors of production in a surrogate market economy country." Def.-Ints.' Br. 17.

Plaintiffs' argument that the local factors of China and India should be compared in the surrogate value calculation is unconvincing.  The surrogate value statute is not intended to make adjustments for local factors in the NME country at issue.

On the contrary, the purpose of 19 U.S.C. § 1677b(c) is to avoid

the potentially skewed local factors in a NME country by

replacing them with suitable surrogates from a comparable market

economy country.  This is, of course, particularly true with

respect to the price for which a product is sold in an NME

country.  *Rhodia, Inc. v. United States*, 25 CIT 1278, 1286, 185

F. Supp. 2d 1343, 1351 (2001) (citing *Nation Ford Chem. Co. v.*

*United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999)) (finding

that the purpose of the statute is "to construct the product's

normal value as it would have been if the NME country were a

market economy country").  Therefore, the court holds that

Commerce was not required to consider the differences between

China and India, as identified by plaintiffs, when determining

the surrogate value of the whole garlic bulb.

Plaintiffs also take issue with Commerce's decision to use

Super A grade garlic prices as surrogate values.[14]  Pls.' Br. 11-

12.  The Department based its decision to use the values for

Super A grade garlic bulbs, when constructing normal value, on

its conclusion that all plaintiffs "reported garlic bulb size in

excess of 55 mm, and because bulb sizes that are 55 mm and above

are typically classified as [Super A] grade garlic."  Issues &

---

[14]     In previous reviews, Commerce has determined that the
price at which garlic is sold is heavily dependant on physical
characteristics such as bulb size.  Preliminary Results, 73 Fed.
Reg. at 24,046.

Dec. Mem. at Comm. 4.  Put another way, Commerce used the Super A
grade garlic prices, which covered bulbs larger than fifty five
millimeters in diameter, because plaintiffs reported sales of
bulbs of fifty five millimeters and larger in their questionnaire
responses.  The APMC Bulletins reported price data for each grade
based on size.

    Plaintiffs assert that Commerce's decision was not supported
by substantial evidence.  Pls.' Br. 12 ("Besides the inference
from the statements by unidentified consultants hired by the
Petitioners, Commerce did not obtain any substantial evidence to
support its using the values of [Super A] garlic, as its size is
above 55 mm according to Commerce, to calculate the surrogate
value for the Respondents.").  Plaintiffs, however, fail to point
to any evidence tending to support a conclusion that some other
type or grade of garlic bulb should have been used.  Rather, they
argue solely that Commerce's conclusion to use the Super A grade
garlic bulb must have been based on statements made by defendant-
intervenors' consultants, and, therefore, was not supported by
substantial evidence.  Pls.' Br. 12.

    Clearly that is not the case.  There is no dispute that all
of plaintiffs' reported sales were of bulbs fifty five
millimeters or larger, and that the price of garlic is based on
size.  Issues & Dec. Mem. at Comm. 4.  Bulbs of this size were
recorded in the APMC Bulletins as having been graded and sold as

Super A grade garlic.  The court, therefore, holds that
Commerce's use of Super A grade garlic values was supported by
substantial evidence.

    C.   Contemporaneity of Azadpur APMC Super A Grade Garlic
        Data

Plaintiffs next argue that, because the APMC Bulletin data
for Super A grade garlic lacks entries for the period between
March 22, 2007 and April 30, 2007, it is not contemporaneous with
the POR, and, therefore, is unsuitable as surrogate data.  Pls.'
Br. 13.  Commerce, however, had APMC Bulletins for the days with
which plaintiffs take issue, and found that there were no sales
of Super A grade garlic on those days.  Issues & Dec. Mem. at
Comm. 4 ("Moreover, the Department has reviewed the Bulletin
price data and is satisfied that each day where data could have
been available at the APMC, that data was submitted.").
Plaintiffs insist that, because Commerce did not seek further
evidence to prove that no transactions occurred during that
period, its decision to use the APMC Bulletin data was "lacking
substantial evidence."  Pls.' Br. 14.  Plaintiffs, thus, argue
that the APMC data is incomplete, and, therefore, not
contemporaneous with the POR.  Pls.' Br. 13.  As an alternative
to the Super A grade garlic data, plaintiffs contend that
Commerce should have used other information on the record, such
as the A grade garlic data, as there were transactions for the A

grade garlic on the missing days.  Pls.' Reply Br. 5.

     The Department states that it had every APMC bulletin for

the POR on the record, and determined that, for the period of

March 22, 2007 through April 30, 2007, there were no transactions

for Super A grade garlic.  Issues & Dec. Mem. at Comm. 4 n.44.

Plaintiffs failed to put any evidence on the record challenging

this conclusion.  Instead, they assert that "the missing

information is extremely unfavorable to the [plaintiffs]."  Pls.'

Br. 14.  As a result, it is clear that the Department had on the

record all of the Super A sales made during the POR.

     As to plaintiffs' argument that Commerce should have used

values for A grade garlic in addition to the values for Super A

grade garlic in its calculations, the Department considered this

possibility and rejected it.  Issues & Dec. Mem. at Comm. 4.

Commerce concluded that there was no justification for using A

grade garlic prices because A grade bulbs are of a smaller

average diameter than Super A grade bulbs, and, therefore, less

similar to the garlic bulbs plaintiffs exported, which were all

larger than A grade.  *Id.*  ("[B]ecause the Respondents have all

reported sizes of 55 mm and above, and because bulb sizes that

are 55 mm and above are typically classified as [Super A] grade

garlic, we have continued to value the whole garlic bulb using

[Super A] grade data from the *Bulletin*.") (emphasis in original).

As a result, using the price values for A grade garlic would have

led to a less accurate result than using just Super A grade

garlic.  Plaintiffs provided no compelling reason for including

in the average a product that they did not actually sell.

Because the Super A grade bulbs were more product specific and

because Commerce had APMC Bulletin data for each date that garlic

bulbs similar to that exported by plaintiffs were actually sold,

Commerce's decision to use the Super A grade garlic based on

sales contemporaneous with the POR, is supported by substantial

evidence and is sustained.


     D.   Broad Market Average of Super A Grade Garlic Values

     Plaintiffs also challenge Commerce's determination that the

APMC data represents a broad market average.  Pls.' Br. 14.  In

making their argument, the Chinese companies correctly state that

it is Commerce's practice to use country-wide data instead of

regional data when the former is available.  Pls.' Br. 14; Issues

& Dec. Mem. at Comm. 4.  In support of this argument plaintiffs

note that the Azadpur APMC is one of 7,000 APMCs throughout India

and that the Azadpur APMC garlic transactions accounted for 5.583

percent of all garlic transactions across India in 2006.  Pls.'

Br. 14-15.

     Commerce, however, found that the APMC Bulletin data was

country-wide and "a reliable and credible representation of a

broad market representation."[15]   Issues & Dec. Mem. at Comm. 4

("A careful examination of the Bulletin shows that agricultural

products from all over India are sold at Azadpur APMC. . . .   In

addition, we note that the data set used by the Department to

calculate the garlic bulb surrogate value for [Super A] grade

garlic represents over 11 million kilograms of garlic sold from

six Indian states.").   In other words, Commerce found that, based

on the size and scope of the Azadpur APMC and the volume of goods

traded at the market, the APMC Bulletin data met Commerce's

preferred criteria for surrogate values.

The Department has sufficiently demonstrated that the APMC

data set does in fact represent a broad market average, as it is

from a large agricultural market in India and is for a

substantial portion of the garlic market in that country.   The

evidence plaintiffs placed on the record is insufficient to call

into question any of Commerce's findings regarding whether the

APMC Bulletin data represents a broad market average.   In sum,

Commerce's decision to use the APMC Bulletin data as a broad

market average is supported by substantial record evidence.

---

[15]     In order to meet its own preference for a country-wide
data set, Commerce chose to use data for grade Super A garlic
produced in six different Indian states sold at the Azadpur APMC,
and not data from a single state as had been done in previous
reviews.   Issues & Dec. Mem. at Comm. 4 n.43.

    E.    Commerce's Determination That the AGMARKNET Data did
not Constitute the "Best Available Information"

During the administrative proceedings, plaintiffs urged
Commerce to select either the WTA data or the AGMARKNET data.
Before the court, plaintiffs have made no argument for the WTA
data, and insist that the information on the AGMARKNET website
should be used.  Commerce considered the AGMARKNET data offered
by plaintiffs, but found that the "four-page descriptive brochure
and a sample page from [AGMARKNET]'s website showing garlic
prices for one day" did not constitute the best available
evidence.  Def.'s Mem. 23.  An examination of the AGMARKNET data
reveals that it does not have information relating to garlic by
grade.

Commerce's decision not to use the AGMARKNET data is
sustained.  This is because one day of the ungraded AGMARKNET
sales did not satisfy the Department's preference for product
specific data that is contemporaneous with the POR.  Thus, it is
apparent that Commerce, as required by statute, considered the
AGMARKNET data, and was reasonable in concluding that it did not
constitute the "best available information."  *See* 19 U.S.C.
§ 1677b(c)(1).

III. Plaintiffs' Evidence Concerning Effect of Flooding on Garlic
     Prices in India

Finally, plaintiffs assert that Commerce failed to take into

account a rise in garlic prices in India during the POR,

resulting from the disruption of the growing season by flooding.

Pls.' Br. 17. Although plaintiffs assert that the flooding

caused an abnormal increase in garlic prices during the POR, the

sole evidence they placed on the record is a newspaper article

speculating on the possible effect of local flooding on garlic

prices. AR Doc. No. 103, Ex. 10 ("Retail prices of garlic *may*

double by December because of low production and wastage due to

floods.") (emphasis added).

This article does not constitute any evidence that flooding

did, in fact, affect prices or to what degree prices were

affected. Plaintiffs could have timely placed factual

information of flooding on the record in the administrative

proceedings before Commerce, but failed to do so. As such, the

Department correctly concluded that it had no information from

which to draw a conclusion, one way or another, about the effect

of flooding on the price of garlic when determining the surrogate

price for the whole garlic bulbs.

## CONCLUSION

Based on the foregoing, the court denies plaintiffs' motion for judgment upon the agency record and sustains Commerce's final results.

                                    __/s/ Richard K. Eaton__
                                       Richard K. Eaton


Dated:      December 16, 2010
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____  :
                                :
JINING YONGJIA TRADE CO.,       :
LTD., QINDAO TIANTAIXING FOODS  :
CO., LTD., and HEBEI GOLDEN     :
BIRD TRADING CO., LTD.,         :
                                :
              Plaintiffs,       :   Before: Richard K. Eaton, Judge
                                :
      v.                        :   Court No. 08-00386
                                :
UNITED STATES,                  :
                                :
              Defendant,        :
                                :
      and                       :
                                :
FRESH GARLIC PRODUCERS          :
ASSOCIATION, CHRISTOPHER        :
RANCH LLC, THE GARLIC COMPANY,  :
VALLEY GARLIC, and VESSEY AND   :
COMPANY, INC.,                  :
                                :
              Def.-Ints.        :
_____  :
```

<u>JUDGMENT</u>

Upon consideration of the papers and proceedings had herein,
and in conformity with the court's decision in this matter, it is
hereby

ORDERED that plaintiffs' motion for judgment on the agency
record is denied.  Accordingly, this case is dismissed.

/S/        Richard K. Eaton
─────────────────────────────
           Judge

Dated:    December 16, 2010
          New York, New York